```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF KENTUCKY
 2                    LEXINGTON DIVISION

 3  UNITED STATES OF AMERICA,      .     Docket No. CR 08-78
                                   .
 4       Plaintiff,                .     Lexington, Kentucky
                                   .     March 14, 2008
 5          v.                     .     10:00 a.m.
                                   .
 6  TIMOTHY SCOTT RICHERSON,       .     Detention Hearing
                                   .
 7       Defendant.                .
    . . . . . . . . . . . . . .    .
 8
                    TRANSCRIPT OF PROCEEDINGS
 9          BEFORE THE HONORABLE JAMES B. TODD
          UNITED STATES DISTRICT MAGISTRATE JUDGE
10
    APPEARANCES:
11
    For the Plaintiff:  Ms. Hydee Hawkins
12  859-685-4850        Assistant United States Attorney
                        260 West Vine Street, Suite 300
13                      Lexington, KY 40507-1671

14  For the Defendant:  Mr. Patrick F. Nash
    859-254-3232        129 W. Short Street
15                      Lexington, KY 40507

16  Court Reporter:     K. Ann Banta, RPR, CRR
                        101 Barr
17                      Lexington, KY 40507
                        (502) 545-1090
18

19  Proceedings recorded by mechanical stenography,
    transcript produced by computer-aided transcription.
20

21

22

23

24

25
```

1                         Friday morning session,

2                         March 14, 2008 at 10:00 a.m.

3                              - - -

4            THE COURT:  All right, Madam Clerk, call the

5    next matter, please.

6            THE CLERK:  Yes, Your Honor, Lexington

7    criminal action no. 08-78, United States of America

8    v. Timothy Scott Richerson, called for detention

9    hearing.

10           THE COURT:  Let the record show that the

11   United States is present represented by assistant U.S.

12   attorney, Hydee Hawkins, that the defendant is present

13   in the courtroom along with his counsel, Patrick Nash.

14           All right, Miss Hawkins, is the United States

15   ready to proceed?

16           MS. HAWKINS:  We are, Your Honor, we will be

17   calling one witness.

18           We would ask to exclude all the potential

19   defense witnesses.

20           This is a presumption case.  However, we do

21   plan to offer testimony about the facts in this case.

22           THE COURT:  All right.  Are you ready to

23   proceed, Mr. Nash?

24           MR. NASH:  Ready to proceed, Your Honor.

25           THE COURT:  Do you have any witnesses?

Clyde Bertram – Direct Examination

 1  MR. NASH:  I don't anticipate calling any
 2  witnesses.

 3  I am not sure that the rule of exclusion
 4  necessarily has to apply.

 5  But I don't -- I don't expect to call any
 6  witnesses.

 7  THE COURT:  All right.  Miss Hawkins, you may
 8  call your witness.

 9  MS. HAWKINS:  Thank you, Your Honor, at this
10  time the United States would call Clyde Bertram.

11  THE COURT:  Come around.

12  MS. HAWKINS:  I would also note for the
13  record that I have given Mr. Nash a copy of this
14  detective's narrative.

15  So if he refers to something, Mr. Nash has a
16  copy of his report.

17  THE COURT:  Okay.

18  THE CLERK:  Please raise your right hand.

19  (Witness sworn.)

20  – – –

21  CLYDE BERTRAM, PLAINTIFF'S WITNESS, SWORN
22  DIRECT EXAMINATION
23 By Miss Hawkins:
24 Q.  Can you please state your full name and spell your
25 full name for the record.

Clyde Bertram – Direct Examination

1 A.   Detective Clyde Bertram.  Spelling of first name

2 is C-L-Y-D-E.  Spelling of the last name is

3 B-E-R-T-R-A-M.

4 Q.  What is your current occupation?

5 A.  I am a detective with the Kentucky State Police,

6 currently assigned to the Electronic Crimes Section.

7 Q.  First, how long have you been a police officer?

8 A.  Since May 20th, 1990.

9 Q.  How long have you been assigned to the Electronic

10 Crimes Section?

11 A.  A little over two years, since December of 2005.

12 Q.  In your current assignment, have you had

13 specialized training in the area of investigating

14 internet crimes against children?

15 A.  Yes, ma'am, I have.

16 Q.  Does that include both formal training and being

17 involved in a number of investigations over the last

18 couple of years?

19 A.  Yes, ma'am.

20 Q.  I would like to direct your attention to the case

21 we are here on today.

22         Did you become involved in an investigation

23 regarding Mr. Richerson in the fall of 2007?

24 A.  Yes, ma'am, I did.

25 Q.  Can you tell the court, first, how it was that

Clyde Bertram – Direct Examination

1 you became involved.

2          And then tell the court, what, if anything,

3 happened initially once you were involved.

4 A.  In October 2007, I think October the 9th, I was

5 contacted by Richmond Police Department Detectives

6 Brian Laugherty and Eric Long.  They met with me at my

7 office.

8          They requested assistance in a case regarding

9 a suspect who had traveled from the Greensburg area to

10 Richmond and who had had sexual contact with a

11 fourteen-year-old female.

12          They had discovered -- the case had been

13 brought to their attention.

14          The mother of the fourteen-year-old had

15 discovered some disturbing chats of sexual content on

16 her daughter's phone and had contacted them.

17          We, at the Electronic Crimes Section, began

18 an investigation to assist them in this -- in this

19 matter.

20          And I had looked at the interviews where they

21 had conducted with the victim.

22          And during the interview, the victim had told

23 them that she had met the suspect on a MySpace

24 account.

25          She had been introduced basically by a friend

Clyde Bertram – Direct Examination

1  of hers.

2          The MySpace account was Youth for Christ

3  Ministries.

4          I went to the account, and it showed the

5  account holder, the profile, a sixteen-year-old male.

6          The victim stated that she knew he was older

7  than that and that she began talking to him in the

8  summer of 2007 around June or July.

9          She said they talked to -- began talking at

10 first about religious things.

11          And he had asked her then to add her to his

12 web page.

13          And shortly after that communication, they

14 began talking.

15          She went to the Taylor County Fair and the

16 Adair County Fair during the summer.

17          I think she is originally from that area

18 where she met the suspect in person.

19          After that, then the communication continued

20 on with phone, a text and a lot of MSN chat.

21 Q.  What does that stand for?

22 A.  Microsoft Network.  On or about then September

23 15th and September 22nd, suspect made two trips to

24 Richmond, Kentucky from Greensburg and had contact

25 with the victim.

Clyde Bertram – Direct Examination

1    Between the two trips, they continued to

2 communicate on the chat.

3    There were several profiles used that we

4 discovered.

5    He was also communicating with her under an

6 account Medic Man R1.  That was a -- that was a

7 MySpace account also.

8    And then they were communicating in chat on

9 MSN, her using the name Killer Kitty and him using the

10 profile Sexy Kitten.

11    On the first trip to Richmond, the victim

12 stated that he road a motorcycle up, that they held

13 hands and that he had kissed her on the neck.  That

14 was on or about September the 15th.

15 Q.  Did he also have her remove any of her clothing on

16 that first date?

17 A.  He had asked her to remove her bra.

18 Q.  And did she from your -- from your information?

19 A.  From my information, that she did.  Then on the

20 second trip to Richmond, which was on or about

21 September 21st, he came back to Richmond.

22    They went for a ride on the motorcycle there

23 in -- and stayed in Madison County.

24    Stopped at a park, supposedly not very far

25 from the victim's residence, where the suspect

Clyde Bertram – Direct Examination

1  digitally penetrated the victim.

2          He also exposed his -- she said he also

3  exposed his penis to her and that she did touch it.

4          She said during the chats that he has

5  masturbated for her on Webcam.

6          States that he -- she -- he has asked her and

7  that she has disrobed for him on Webcam while he

8  masturbated.

9          And some of the chats that we recovered, he

10 asked her if she wants him to come back.

11          And was she going to sneak him in and that

12 Mom could find him laying in bed with her in the

13 morning.

14          He talks about getting a motel room at the

15 end of the victim's street, and even went on to check

16 on the price of it and to find the price was $41.50.

17          I contacted Detective Laugherty and asked if

18 he could confirm this information, and he did.

19          He said that there was a motel very close

20 proximity there to the victim's house which did

21 advertise a rate of $41.50.

22          Suspect also in the chats tells the victim

23 the times that he is naked.

24          Going back to the motel chat, he said that he

25 didn't do that because he wasn't for sure that she

Clyde Bertram - Direct Examination

1 would show up on -- on that evening.

2          He tells the victim that he is naked in

3 several of the chats.

4          He talks about that he should have used two

5 fingers when he digitally penetrated her.

6          Says that he didn't want to hurt her, then

7 said that he was afraid, in his words, that he would

8 pop her cherry.

9          He also says that he would have taken her

10 somewhere where he could have used a condom.

11          He asked her -- or tells the victim that he

12 loves her so much, that he is deeply in love with her

13 and says that he will wait until she is sixteen if he

14 has to.

15          So he clearly knew that she was under sixteen

16 and knew her age prior to the contact.

17          Another of these chats he talks about, in his

18 words, of fingering and rubbing the victim's clit.

19          The victim asked if it would hurt the first

20 time, and that he said that he was going to try to

21 find out that night.

22          He asked him (sic) if she wanted him to be

23 her first.

24          He tells her then that he is masturbating and

25 then states that, "I love you, Ashton Richerson,"

Clyde Bertram – Direct Examination

1  giving the victim his last name.

2          A search was conducted at the suspect's

3  residence on October the 12th.

4          During that, several computers were found at

5  the residence including a cell phone.

6          Those have been forensically examined.  The

7  video which the victim described him sending to her

8  was found during that forensic examination.

9          And it was as the victim said, him

10  masturbating.

11          And the specifics was that she described him

12  using -- when I asked if there was anything in

13  particular, she said, "Yeah, there was something

14  orange in his hand."

15          In the video where he is masturbating there

16  -- and she said that he described it as his toy.

17          Actually in the video there is him

18  masturbating, and there is a orange type device that

19  he has in his hand.

20          After the search a few days later, I think on

21  the -- on the 15th of October, I spoke with Detective

22  Israel Slinker, works the Greensburg area.

23          And Detective Slinker had detained from Jamie

24  Richerson, the suspect's wife, that she had located

25  some items which were -- we did not find during this

Clyde Bertram – Direct Examination

1  search, I think in his jacket pocket, his motorcycle

2  jacket pocket is what Detective Slinker advised me

3  that she had found a MapQuest, which is a computer map

4  with directions type document in his jacket.

5          The MapQuest gave directions from

6  Campbellsville, which is where he works, to --

7  directions to the victim's residence.

8          He also got from her a photograph of -- which

9  was in his wallet of the victim.

10          It was a school photograph.  It wasn't one

11  that was -- it wasn't computer-generated or he would

12  have downloaded from the web.

13          It was like a personal, actual like on photo

14  paper that he had in his possession of the victim, and

15  also she found a condom in the jacket.

16  Q.   Detective Bertram, in your review of the chats

17  and in a follow-up interview of the victim, did you

18  confirm that throughout their chats and texts that she

19  in fact had simply told the defendant that she was

20  fourteen years old more than once?

21  A.   Yes, ma'am.

22  Q.   And also earlier you had talked about the

23  defendant masturbating for the victim.

24          Have you also found out through your

25  investigation through the chats and through your

Clyde Bertram - Direct Examination

1  contact with the victim that he also requested her not

2  only to disrobe, which you have already told the

3  court, but can you tell us, did he ever request and

4  did she also masturbate for him on the Webcam as well?

5  A.   Yes, she did.

6  Q.   And did this happen on more than one occasion

7  during the time period that's set forth in the

8  indictment?

9  A.   Yes.

10 Q.   Okay.

11 A.   That is set out in the chats and described in the

12 multi-chats that they had.

13 Q.   Without going through every single chat, can you

14 tell the court, especiallily during August and

15 September between the two visits that you talked about

16 to Richmond and from the last visit to the time this

17 came to the police's attention, were there some

18 explicit sexual chats beyond the digital penetration

19 that related to requests for oral sex and intercourse

20 as well?

21        And if so, can you tell the court about those

22 as well?

23 A.   There was one in particular where it stands out

24 to where he is -- I don't know if I mentioned that or

25 not -- where he is talking to her about wanting to be

Clyde Bertram – Direct Examination

1 her first and that he would wait until she is sixteen,

2 if she –– if he had to.

3         And that way, that her mother, it wouldn't

4 matter what she had to say about it, basically.

5 Q.  What about the chats and from talking with the

6 victim and what was recovered and in her interview,

7 did it indicate that he had requested of her at this

8 time to engage in oral sex with him and what did she

9 say?

10 A.  I remember the one where he did say that –– where

11 after he had asked her to touch it, that he made

12 reference to that –– for her to have oral sex on him.

13         And also he made reference to performing oral

14 sex on her.

15 Q.  And what was her response and why?

16 A.  I believe her response was that she preferred

17 that she would want to wait.

18 Q.  Did you also, in your investigation, have the

19 opportunity to go through after the forensics were

20 complete and look through all the different MySpace

21 accounts and friends and visually who the defendant

22 had been communicating with during this time?

23         And can you summarize for the court in

24 looking at the photographs and the content what you

25 found in addition to this victim who was fourteen on

Clyde Bertram – Direct Examination

1 the defendant's MySpace pages?

2          And I believe you told us he had at least

3 two, how many total did he have?

4 A.   Ones that I know of are the Youth for Christ

5 Ministries and the Medic Man R1.

6          I think the Medic Man R1 was due to his

7 employ as a paramedic.

8          On the Youth for Christ Ministries, there

9 were numerous teenagers.

10          Most were females that were members or

11 friends added to his account.

12          And by their pictures that they had put on

13 their profiles and information they had put on their

14 profiles, the ones we were able to go to, most were

15 even under sixteen.

16          There was one in particular that really drew

17 my attention as far as this Youth for Christ

18 Ministries account, was there was a picture of a

19 young -- or profile by a young female, and under her

20 caption she had written, "Party like a rock star, F,

21 star, star, star, K, like a porn star."

22          And even though she had written that, I

23 found that to be very disturbing to me, I guess to be

24 on a site or web page, if it was promoting -- actually

25 promoting religious context, for that to be allowed

Clyde Bertram – Direct Examination

1 without any correction.

2       I did not see any -- any type of correction

3 from him for that.

4 Q.  Couple last things.  First going back originally

5 to the fair where they met in person.

6       Can you tell the court as far as who else was

7 at that meeting, the defendant has children -- were

8 some of his children actually there with the victim

9 and some of her friends and with the ages of the

10 individuals at the fairs that the defendant was

11 meeting with?

12 A.  They were like fourteen, fifteen-year-olds,

13  females that spoke with him.

14 Q.  Also in reviewing the chats and the text, did you

15 find any indication through the communication with the

16 defendant, was he ever advising or directing the

17 victim of how to destroy or get rid of some of this

18 evidence, this trail they were making and giving her

19 stories to tell her parents?

20 A.  Yes, there was content related to destroying or

21 how to get it off the computer, there was talk of

22 that.

23 Q.  And was this in relation to the sexual chats they

24 were having, the ones that were sexual in nature?

25 A.  Yes, there was.

Clyde Bertram – Direct Examination

1  Q.   And finally, you have talked about two specific

2  dates.

3          You said the victim's mom then contacted

4  police.

5          Can you tell the court after the second

6  meeting up until October 9th in reviewing the chats

7  and the text, did the sexual discussions and the

8  defendant's desire to continue on with a sexual

9  relationship with the victim continue up until October

10 9th when this came to the police's attention?

11 A.   Yes, it did.

12 Q.   And finally in your preparing for this hearing

13 and working on this case, did you have the opportunity

14 to personally meet with the victim just to go through

15 the interview with the other police officers?

16 A.   Yes, ma'am, I have.

17 Q.   In addition to that, did you have an opportunity

18 to talk to the victim and ask her what, if anything,

19 in the chats or conversations the defendant had ever

20 shared with her regarding any involvement he had with

21 other -- or talk about any other girls her age at his

22 residence or otherwise that was sexual in nature?

23 A.   I think that he did -- give me just one second.

24 There was another girl which he had contact with

25 online which the victim talked with which was fifteen

Clyde Bertram – Direct Examination

1 according to the victim and also the friend that the

2 victim was introduced to Mr. Richerson from, she was,

3 I think, fifteen also.

4 Q.   Well, the specific things, what, if anything, did

5 she tell you that the defendant said about a teenager

6 being at his residence without clothing?  Do you

7 recall hearing that?

8 A.   I don't recall that.

9 Q.   All right, is there anything else or is that

10 pretty much, in looking at your notes, is there

11 anything else she said to you in addition to what you

12 have already told the court?

13 A.   I think that is all.

14 Q.   Okay, and did the forensic information and the

15 chats confirm or match what the victim said had

16 happened between them both in the chats and

17 physically?

18 A.   Yes, they did.

19 Q.   Okay.

20          MS. HAWKINS:  No further questions, Your

21 Honor.

22          THE COURT:  Mr. Nash?

23          MR. NASH:  Thank you, Your Honor.

24                              -  -  -

25

Clyde Bertram – Cross Examination

1                          CROSS EXAMINATION

2    By Mr. Nash:

3    Q.   Detective Bertram, you -- which post are you out

4    of?

5    A.   I am not out of a post.  I work the Electronic

6    Crime Section in Frankfort.

7    Q.   Okay, are you familiar with the Greensburg area

8    and that area of the state or is this your first

9    contact down there?

10   A.   I have been through that area.  I am not -- have

11   never worked that area.

12   Q.   Okay.  But you did go to my client's house as

13   part of the search warrant?

14   A.   Yes, ma'am -- yes, sir.

15   Q.   So you have become familiar with at least his

16   premises and his family and that sort of thing?

17   A.   Somewhat.

18   Q.   And it is a house that he was living in, correct?

19   A.   Yes, sir.

20   Q.   Okay, and you spoke with his wife.  Do you see

21   his wife here in the courtroom?

22   A.   Yes.

23   Q.   Okay, and apparently she has been cooperative

24   with you all throughout this investigation even to the

25   point of turning over some evidence?

Clyde Bertram – Cross Examination

1  A.   Yes, sir, she was cooperative.

2  Q.   All right.  And you know that my client has a

3  couple of children at home?

4  A.   Yes, sir, I do.

5  Q.   And you know, and you have discovered that my

6  client has been employed in the past as a -- as a EMS

7  or EMT, did you say discover that as well?

8  A.   Yes, sir.

9  Q.   And he had been long time employed up until this

10 case came about?

11 A.   I knew that he worked as a -- in the EMT field,

12 EMS field.

13 Q.   Okay, and did you discover how long he had been

14 working in that field?

15 A.   No, sir, I had no idea how long.

16 Q.   Now, are you the officer that brought the state

17 charges relating to this same incident in October?

18 A.   Yes, sir.

19 Q.   Okay, and those were in Green Circuit Court?

20 A.   That's correct.

21 Q.   All right.  And -- and you are aware that in

22 January that my client was bonded out on those

23 charges?

24 A.   I knew that he was on bond, sir.

25 Q.   And did you know that it has been since January?

Clyde Bertram – Cross Examination

1  A.   I knew that it was sometime after December that

2  he was on bond.

3  Q.   All right, so you have been aware that he has

4  been out on bond for some period of time.

5  A.   Yes.

6  Q.   And are you aware of any violations he's had of

7  his bond since being out on bond?

8  A.   Not to my knowledge.

9  Q.   Or any other contacts he's had with any minor

10  children or use of the computer?

11        Are you aware of anything like that since

12  he's been out on bond?

13  A.   Not that I am aware of.

14   Q.  Now, when you executed the search warrant there

15  at the house, did you seize computers?

16  A.   Yes, sir.

17  Q.   And computer equipment?

18  A.   Yes, sir.

19  Q.   Did you leave any sort of computers or computer

20  equipment there or did you take it all?

21  A.   We took computers.  As far as computer

22  equipments, things such as monitors, keyboards, things

23  of that nature, they have no forensic value, so we

24  don't take items such as those.

25  Q.   Okay, but you took all the computers out of the

Clyde Bertram – Cross Examination

1  house?

2  A.   Yes, sir.

3  Q.   And I neglected to ask you, in meeting the

4  defendant's family and investigating the case, did you

5  discover that his wife is also employed?

6  A.   Yes.

7  Q.   As a nurse perhaps?

8  A.   Yes.

9  Q.   Now, in -- in the case in Green County that you

10 brought, has there been some court hearings and

11 appearances necessary in that case?

12 A.   Yes, sir.

13 Q.   Have you been aware that my client ever failed to

14 appear for any of those?

15 A.   Not that I am aware.

16 Q.   And the -- did you -- were you part of the folks

17 that arrested him on these federal charges?

18 A.   I brought the -- contacted the courts here and

19 testified at the grand jury regarding these charges.

20 Q.   Actually what I am asking you is did you -- were

21 you among the individuals who actually arrested him on

22 these federal charges?

23 A.   Physically arrested him?

24 Q.   Were you there when he was arrested?

25 A.   No, sir.

Clyde Bertram - Cross Examination

1 Q.   Were you -- have you been made aware that he was

2 arrested at his home?

3 A.   Yes.

4 Q.   And were you aware that he -- that he put up a

5 fight or scuffle or tried to hide or was he arrested

6 without incident?

7 A.   As far as I know it was without incident.

8 Q.   Now, in regards to the allegations in this case,

9 the -- you mention that there were some emails with

10 this person who called herself Killer Kitty, is that

11 what she called herself?

12 A.   Yes.

13 Q.   And that you reviewed some of these emails where

14 this person, Killer Kitty, said that she was fourteen

15 years old?

16 A.   Yes.

17 Q.   Do you know the timing of those emails?   In other

18 words, when were those emails written?

19 A.   These emails go -- I mean, they go back to early

20 September until late in September, prior to even the

21 events where he actually traveled to Richmond.

22 Q.   So you reviewed some emails where Killer Kitty

23 claimed to be fourteen years old prior to the first

24 trip to Richmond?

25 A.   Absolutely.

Clyde Bertram - Cross Examination

1 Q.   Okay.  Now, have you -- have you checked the

2 Internet to discover how Killer Kitty portrayed

3 herself on the Internet?

4 A.   I did pull her profile, both profiles up.  I

5 don't have her profile with me to remember exactly how

6 that it was set up.

7 Q.   Okay, did you find a web site that she had or a

8 web page that she had of some sort?

9 A.   Yes, she would have a profile of Killer Kitty.

10 Q.   But you don't remember how she portrayed herself

11 in that profile?

12 A.   Not exactly, no.

13 Q.   Did you find anything explicit -- do you remember

14 anything explicit in that profile?

15 A.   I remember a -- one of the profiles that I do

16 remember is a picture of her and her mother, of them,

17 a photograph.

18 Q.   Was there anything unusual about that picture?

19 A.   Not at all.

20 Q.   Okay, that's all you remember at this time?

21 A.   Yes, sir.

22 Q.   Now, in these contacts that my client allegedly

23 had with -- with this person, Killer Kitty, was there

24 any allegation that there was force used or were these

25 portrayed to you as completely consensual contacts?

Clyde Bertram - Cross Examination

1  A.   A fourteen-year-old can't give consent.

2  Q.   But you understand my question, I am asking you

3  was this fourteen-year-old person, was force used on

4  her or -- or did she go to these meetings of her own

5  free will?

6  A.   He came to Richmond and met her before they met,

7  sir.

8  Q.   I understand that, but when she came to meet him,

9  was he forcing her, or was she going of her own free

10 will?

11 A.   I don't think there was any -- I think she met

12 him.

13        I don't think she was accosted or dragged out

14 of the house or anything like that.

15 Q.   But I mean --

16 A.   But I do think as far as force in the chats where

17 you are continually talking to a fourteen-year-old in

18 this manner, that that does show, even though it's a

19 nonaggressive force, that it is a force.  It is a

20 grooming process.

21 Q.   Okay, so you are calling this a grooming process

22 from what you have seen out of these emails, these

23 chats?

24 A.   Yes, I would consider it a grooming process.

25 Q.   But, again, as far as when they -- apparently by

Clyde Bertram – Cross Examination

1  your testimony they had met twice at a couple of

2  fairs, county fairs, they met twice in Richmond.

3           And on none of those occasions was anything

4  other than subtle or grooming type coercion used; is

5  that accurate?

6  A.   I think that would be accurate except that it was

7  also digital penetration which she cannot consent to.

8  Q.   I understand that legally a fourteen-year-old

9  can't consent.

10 A.   That's correct.

11 Q.   Is that what you are referring to?

12 A.   Yes, sir.

13 Q.   Okay.  Now, you mention that you discovered in

14 the forensic analysis contacts on these -- on these

15 MyPage web sites with other people who were teenagers,

16 correct?

17 A.   That's correct.

18 Q.   Did you also discover, at least for some period

19 of time, that my client was a youth minister of some

20 sort?

21 A.   Yes.

22 Q.   So -- so at least by virtue of position of a

23 youth minister he had some reason to have contact with

24 teenagers.

25 A.   I would suspect.

Clyde Bertram - Cross Examination

1  Q.   Now, in these other contacts on the web site, did

2  you discover chat between my client and these other

3  teenagers that was sexual in nature?

4  A.   There was some chat with other teenagers that was

5  sexual in nature.

6         But -- it was with other teenagers, and there

7  was no indication that there was any action being

8  taking -- being taken on those --

9  Q.   Okay, was there chat between the other teenagers

10 that was not sexual in nature that you discovered?

11 A.   Yes, I did.

12 Q.   And in these postings on this web site, you

13 mentioned that other than the one person who

14 themselves posted something that used a bad word, the

15 rest of the postings were all not sexual in nature; is

16 that correct?

17 A.   What was posted there were -- I do not have any

18 chats related to them.

19        So I don't know if there is any illicit or

20 sexual chat that was actually going on with others and

21 it hadn't been reported to me.

22 Q.   Were there any chats between other people that

23 you know of?

24        You said you didn't find any chats.  I mean,

25 do you believe there were chats that you just weren't

Clyde Bertram – Redirect Examination

1 able to find or there were just no chats at all?

2 A.   I don't know if there are or not.

3 Q.   Okay.  And do you know the -- the conditions of

4 my client's bond in Green Circuit Court that he has

5 been on for the last couple months?

6 A.   I do not.

7 Q.   Do you even know the amount of the bond that he

8 was required to post?

9 A.   I do not.

10          MR. NASH:  That's all the questions I have,

11 Your Honor.

12          THE COURT:  Anything else of this witness,

13 Miss Hawkins?

14          MS. HAWKINS:  Very briefly, Your Honor.

15                        - - -

16               REDIRECT EXAMINATION

17 By Ms. Hawkins:

18 Q.   At any time, Detective Bertram, in your

19 discussion with the victim, from her conversations,

20 texts on the phone, chats, did she ever represent

21 herself to be anything but fourteen years old to the

22 defendant?

23 A.   Not that I am aware of.

24 Q.   From everything that you have seen, did you ever

25 see where she represented herself to be any older than

Clyde Bertram – Redirect Examination

1  fourteen?

2  A.   Nothing that I have seen and --

3  Q.   Is that a significant legal issue for even making

4  a decision whether to bring a case to a prosecutor

5  that the child has to be below a certain age?

6  A.   Yes.

7           MS. HAWKINS:  I don't have any further

8  questions, Your Honor.

9           MR. NASH:  Nothing further.

10          THE COURT:  All right.  Thank you,

11 Detective.  You can stand down.

12          THE WITNESS:  Thank you, sir.

13          THE COURT:  Do you have any other witnesses

14 to call, Miss Hawkins?

15          MS. HAWKINS:  No, Your Honor, I just want to

16 let the court know that the victim's mother is in the

17 courtroom.

18          She -- under the victim's right -- has a

19 right to be here and to speak.

20          But I believe she just wants the court to

21 know that she is present here today.

22          But I don't think she wishes to say anything

23 to the court.  That's all, Your Honor.

24          THE COURT:  Mr. Nash, do you have any

25 witnesses to call?

Clyde Bertram – Redirect Examination

1          MR. NASH:  No witnesses, Your Honor.

2          THE COURT:  All right.  Well, Mr. Nash, I'll

3 hear any argument that you want to make in opposition

4 to the United States' motion.

5          MR. NASH:  Thank you, Judge.  I note in the

6 bond report that the probation officer does not feel

7 that my client is a risk of flight.

8          I think that that's certainly a supportable

9 conclusion.

10          My client is a long-time resident of that

11 area of the state, either Taylor or Green County,

12 which of course are bordering counties.

13          He -- he owns a home there, he has a wife and

14 children there, he has family there.

15          He has a brother and a mother and uncles and

16 aunts.  His father I guess is deceased.

17          So he certainly has significant ties to the

18 community which would indicate that he's not a risk of

19 flight.

20          Your Honor, I think it's very significant in

21 this case.

22          Obviously these are very serious charges.  We

23 are not going to pretend that they are not.

24          But it is very significant in this case that

25 these charges have been pending against my client

Clyde Bertram – Redirect Examination

1 since October in state court.

2          He has been out on bond on those charges for

3 a significant period of time.

4          To my knowledge and to the officer's

5 knowledge there is no -- he's had no problems on

6 bond.

7          There has been no issues of him trying to

8 engage in similar conduct or being otherwise a danger

9 to the community.

10          He's appeared in court when ordered to

11 appear.

12          And every indication is that he will act

13 exactly like that on federal bond.

14          He has a stable place to go.  His wife, who

15 is here in the courtroom as well as his pastor,

16 obviously has known about these charges as well since

17 October.

18          He has been back at home with her and his

19 children.

20          She is here willing to take him back home

21 today.  She is willing to be a third party custodian.

22          I have spoken with her about her duties and

23 obligations.

24          She obviously knows the seriousness of this

25 situation and has even been cooperative with the

Clyde Bertram – Redirect Examination

1 police in turning over evidence that is incriminating

2 evidence against my client apparently.

3          So there is no reason to believe that she

4 would not take obligations to being a third party

5 custodian equally as seriously.

6          And if she observes my client violating any

7 conditions of bond would certainly report those in a

8 timely fashion.

9          Your Honor, he has a good reason to be out on

10 bond other than the obvious, that he's pled not guilty

11 to these charges and needs to prepare a defense.

12          He has a significant eye problem,

13 Your Honor.

14          It's referenced in the presentence or in the

15 bond report.

16          I don't know that the magnitude of it comes

17 through.

18          If I have met with him and it's -- you know,

19 when you see him, it's the left eye is obviously

20 severely affected by glaucoma.

21          It's a very obvious condition.  He has

22 prescription drops, prescription pills that he takes

23 for that that -- that the hope is will -- will lead to

24 this condition not worsening.

25          But it's very bad now.  He doesn't get those

Clyde Bertram - Redirect Examination

1  at the Fayette County Jail.

2        I don't know if they will be able to work

3  that out if he is not released.

4        But certainly if he is out on bond, he can

5  address that and visit his doctor regularly and make

6  sure that that condition doesn't worsen.

7        So for those -- and I would say, Your Honor,

8  about the facts of this case, again, they are serious

9  charges.

10        But there is no evidence of force or

11  violence.

12        I understand the officer's position about

13  legally a fourteen-year-old -- whether a fourteen-

14  year-old can legally give consent, and we all know the

15  law on that.

16        But as far as violence or force or use of a

17  weapon or threats or things like that, there is none

18  of that in this case.

19        The indications are that this fourteen-year-

20  old voluntarily -- not in the legal sense but in the

21  practical sense -- voluntarily went to meet this

22  gentleman on the occasions, if the allegations are

23  taken as true at this point, and I think that is

24  significant, along with the idea of -- of him being

25  out on bond in state court and his behavior since

Clyde Bertram – Redirect Examination

1  October.

2       So I would argue, Your Honor, that all those

3  rebut the presumption.

4       And there certainly are conditions that would

5  ensure the safety of the community, that being third

6  party custodian and being placed in his home on

7  conditions.  Thank you, Your Honor.

8       THE COURT:  Miss Hawkins?

9       MS. HAWKINS:  Thank you, Your Honor.  Well,

10 first, as I indicated to the court, this case is a

11 presumption case.

12      It's presumed that there are no conditions

13 under the sexual statute that can be imposed.

14      And one thing I would like to bring to the

15 court's attention is that while the defendant did make

16 bond recently, he was in custody from October until

17 January; and there was a brief time he did make bail

18 for a certain amount.

19      But in this case there was a gap of about

20 four or six weeks on the federal charges because we

21 were -- the forensic evidence was pending and it just

22 recently got completed.

23      And while possibly charges could have gone

24 over to the forensics evidence in this case which

25 Detective Bertram testified about, the United States'

Clyde Bertram – Redirect Examination

1  thought was pretty critical in this case to go beyond

2  the he said, she said to the weight of the evidence,

3  because with the forensics, that's where they actually

4  recovered the defendant masturbating and the sexual

5  chats that corroborated what the victim said happened

6  on those two dates in September.

7         So I just want to bring that to the court's

8  attention why there has been this gap.

9         As Mr. Nash pointed out, the defendant was

10 working at the time as a paramedic.

11        One cannot imagine any reason why a thirty-

12 nine-year-old man, youth minister or not, any

13 legitimate reason to set up a web site where you

14 represent yourself to be a sixteen-year-old teenage

15 male.  There is no legitimate reason to do that.

16        And it had its exact intended purpose,

17 Your Honor, the people who went to that web site were

18 basically teenage girls, including the victim in this

19 case.

20        And it was a grooming process.  The victim

21 was fourteen years old, Your Honor.

22        And these chats -- and there are hundreds and

23 hundreds, as Detective Bertram told the court.

24        They started out pretty, you know, basically

25 nonsexual.

Clyde Bertram – Redirect Examination

1          But at the very -- as we progressed to the

2   meetings in September, they led up to where the

3   defendant actually sent the victim a video of him

4   masturbating for her, and have her do the same for

5   him.

6          And despite his health issues, got on a

7   motorcycle and drove across the entire state to have

8   sexual contact with a fourteen-year-old child.

9          This just didn't happen in the course of a

10  day.  And, Your Honor, it didn't stop.

11         The only reason it stopped, even after the

12  meeting on September 21st or 22nd, is because the

13  victim's mother discovered some very disturbing texts

14  on the victim's telephone and called the police.

15         So that even after the initial contact, the

16  defendant was still in contact with the victim talking

17  about additional sexual relations, oral sex, you name

18  it, they were discussing it.

19         And the law is very clear, a fourteen-year-

20  old can't consent.

21         I think anybody in this court could not

22  disagree that teenagers typically do not make good

23  decisions.

24         That's why we have these laws.  We have these

25  laws for this exact reason.

Clyde Bertram – Redirect Examination

1          The defendant was a thirty-nine-year-old

2   paramedic and youth minister, and he knew exactly how

3   to play it.

4          And he lured this fourteen-year-old girl in,

5   didn't know her from anywhere else, met with her in

6   person with his own children at a fair and then came

7   across the state to have sexual relations with her.

8          Had her school photo in his wallet.  Had a

9   MapQuest.  Had condoms in his pocket.

10          His intentions are very clear from the

11   evidence.

12          And the strength of the evidence in this

13   case, Your Honor, is extremely strong.

14          That's why we put Detective Bertram on today

15   rather than relying on a presumption because we wanted

16   the court to hear the nature of this evidence.

17          And the defendant, no matter what conditions

18   the court were to set, you can take computers, you can

19   take cell phones.

20          His wife works, his kids, he has a daughter

21   the exact same age of the victim.

22          It's clear the defendant's preference are a

23   fourteen-year-old child.

24          You can't put the defendant in a bubble,

25   Your Honor.

Clyde Bertram – Redirect Examination

1          You can't put him somewhere where he is not

2 going to have access to teenage children.

3          He gave the victim his last name.  There is

4 something not right.  There is something not right.

5          This isn't just somebody sitting at a

6 computer.

7          This is somebody willing to go out and

8 victimize teenagers.

9          And while he might appear, he is certainly a

10 danger to the community and any person in that age

11 group.

12          And we would ask the court to detain the

13 defendant.

14          It's a presumption case.  There has been

15 nothing presented other than him going back and living

16 with his wife, which is exactly where he lived when

17 this happened.

18          And now he is not working.  He's got 7, 24 on

19 his hands, and he was up to nothing good.

20          He was living a double life for this seven or

21 eight months that this offense went on.

22          We would -- for those reasons, we would ask

23 the court to detain the defendant.

24          THE COURT:  Well, this is a presumption case,

25 meaning that because of the nature of the charge that

Clyde Bertram – Redirect Examination

1 there -- there is a presumption that there are no

2 conditions under which the defendant can be released

3 that would reasonably assure his appearance or the

4 safety of the community or persons in the community.

5          So the issue before the court is whether or

6 not that presumption has been rebutted and that there

7 are conditions under which he can be released.

8          The factors that the court must consider

9 include ties to the community, criminal history,

10 nature of the charge, so forth.

11          The defendant has long-time ties to the Green

12 County community and apparently has family ties,

13 employment ties as well as other types of ties,

14 including, apparently, some activities related to

15 religious matters.

16          The defendant argues that the presumption has

17 been rebutted in that in addition to these ties to the

18 community that the defendant has been on state bond

19 since January and has apparently caused no problems

20 while on state bond.

21          The difference between the state statutes and

22 the federal statute under which we are working here

23 today is that there is a presumption that there are no

24 conditions under which he can be released under the

25 state statute.

Clyde Bertram – Redirect Examination

1          To my knowledge, that is not the case with
2  the -- or with -- with the federal statute.
3          To my knowledge that's not the case with the
4  state laws.
5          This case and the evidence presented this
6  morning indicates that this defendant, although he is,
7  I think, thirty-nine years old, represented himself to
8  be a sixteen-year-old, started conversations with a
9  fourteen-year-old, traveled all the way to Madison
10 County to see her and to have sexual contact with her
11 and in fact did have at least digital penetration.
12         He even met her at a fair.  I agree that I
13 don't believe I can put the defendant in a bubble to
14 keep him from having some sort of contact.
15         At this time I don't believe the presumption
16 has been rebutted.
17         I believe that the defendant poses a danger
18 to the community based upon what I have heard this
19 morning.
20         Therefore, I am going to grant the United
21 States' motion for pretrial detention.
22         Defendant will remain in custody pending
23 further proceedings.
24         I will ask the probation office if they will
25 have the probation office in the Western District do a

Clyde Bertram – Redirect Examination

1 home visit and evaluation of the situation with

2 respect to the defendant's residence and home and

3 report back to me.

4          If I feel that that may change the situation,

5 I will reconvene.  Otherwise, the defendant will

6 remain in custody.

7          All right, Mr. Nash, any other matters we

8 need discuss this morning?

9          MR. NASH:  Not at this time, Your Honor.

10          THE COURT:  Miss Hawkins?

11          MS. HAWKINS:  No, thank you, Your Honor.

12          THE COURT:  All right, that will conclude

13 this matter.

14          (The further hearing in this matter was

15 concluded at 11:00 a.m.)

16                          – – –

17

18

19

20

21

22

23

24

25

Clyde Bertram – Redirect Examination

1                        EXAMINATION INDEX

2

Plaintiff's Witnesses:

3

Clyde Bertram

4

Direct by Miss Hawkins . . . . . . . . . . . .   3

5

Cross by Mr. Nash . . . . . . . . . . . . . .  18

6

Redirect by Ms. Hawkins. . . . . . . . . . . .  27

7                         CERTIFICATE

8          I certify that the foregoing is a correct

9  transcript from the record of proceedings in the

10  above-entitled matter.

11  s/ K. Ann Banta             5-14-08
12  K. Ann Banta, RPR, CRR        Date

13

14

15

16

17

18

19

20

21

22

23

24

25